1
2
3
4
5
6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

7
8
9
10
11
12
13
14
15

BONNIE STEARNS-
GROSECLOSE,

          Plaintiff,

     v.

CHELAN COUNTY SHERIFF'S
DEPARTMENT, a division of
Chelan County, CITY OF
CHELAN, a Municipal Corporation,
MIKE HARUM, individually,
GREG MEINZER, individually and
KENT SISSON, individually,

          Defendants.

NO.  CV-04-0312-RHW

**ORDER GRANTING IN PART,
DENYING IN PART
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT, *INTER
ALIA***

16
17
18
19
20
21
22
23
24
25
26
27
28

     Before the Court are Defendants Chelan County & Individuals' Motion for
Summary Judgment (Ct. Rec. 33), Defendant City of Chelan's Motion for
Summary Judgment (Ct. Rec. 41), Plaintiff's Motion to Strike (Ct. Rec. 57),
Plaintiff's Cross-Motion for Summary Judgment (Ct. Rec. 63), Plaintiff's Cross-
Motion for Summary Judgment (Amended) (Ct. Rec. 71), Defendants Chelan
County & Individuals' Motion to Strike Declaration in Opposition to Motion (Ct.
Rec. 75), Plaintiff's Motion in Limine (Ct. Rec. 81), Defendant City of Chelan's
Motion to Expedite (Ct. Rec. 99), and Defendant City of Chelan's Motion to Strike
Reply Memorandum (Ct. Rec. 101).  A hearing was held on December 19, 2005.
Plaintiff was present and represented by Scott Kane.  Kenneth Harper appeared on
behalf of Defendant City of Chelan; Stanley Bastian appeared on behalf of
Defendants Chelan County Sheriff's Department, Mike Harum, Greg Meinzer, and

Kent Sisson.  For the reasons stated below, the Court grants Defendants' motions for summary judgment.

## BACKGROUND

Plaintiff Bonnie Stearns-Groseclose seeks damages, attorney's fees, and reinstatement from Defendants Chelan County Sheriff's Office ("CCSO" or "County"), City of Chelan ("City"), and individual Defendants Mike Harum, Greg Meinzer, and Kent Sisson.  Plaintiff asserts five causes of action: (1) breach of contract and civil service rules; (2) violation of RCW 41.14.250-270; (3) defamation; (4) constitutional violations under 42 U.S.C. § 1983; and (5) employment discrimination based on gender in violation of RCW 49.60.180.

Plaintiff originally filed this suit in Chelan County Superior Court on July 19, 2004.  Defendant City of Chelan removed the case to this Court on August 20, 2004 (Ct. Rec. 1), within 30 days of service of the complaint.  The other Defendants joined in the City's removal.  The Court has proper jurisdiction under 28 U.S.C. §§ 1331 and 1367.

## STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When considering a motion for summary judgment, a court may neither weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

When, as here, the parties file cross-motions for summary judgment, their simultaneous arguments that there are no issues of material fact does not establish that a trial is unnecessary.  Charles Alan Wright *et al.*, 10A *Federal Practice & Procedure: Civil* § 2720 (3d ed. 1998).  "The court must rule on each party's

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 2

1   motion on an individual and separate basis, determining, for each side, whether a

2   judgment may be entered in accordance with the Rule 56 standard." *Id*.; *see also*

3   *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1142,

4   1136 (9th Cir. 2001) (stating that "when parties submit cross-motions for summary

5   judgment, '[e]ach motion must be considered on its own merits'").

### FACTS

7       The following facts are undisputed unless otherwise indicated:

8       Plaintiff was employed as a police officer for the City of Chelan from

9   August 16, 1999, to February 29, 2004. On December 15, 2003, the City and

10  CCSO entered into a Law Enforcement Service Agreement ("LESA") in which

11  CCSO agreed to provide law enforcement services within the City of Chelan.

12      The LESA includes several provisions material to this suit regarding the

13  transfer of authority and personnel from the City to CCSO. The relevant

14  provisions are as follows:

15  2.3 [Law Enforcement Services] shall include the designation of a Chief Executive Law Enforcement Officer, or Police Chief of the City

16  pursuant to RCW 35A.12.020, effective January 1, 2004. The Sheriff or his/her designee will be the assigned Police Chief, consistent with the

17  laws of the State of Washington.

18  2.4 Such services shall include a minimum of five (5) deputies and one (1) sergeant assigned and scheduled to the City of Chelan. Said personnel will provide 24 hour patrol within the city 7 days a week.

19  . . .

20  3.5 Administrative services include planning and statistics, crime analysis, subpoena control, training, weapons, permits, accounting,

21  payroll, personnel, labor relations, media relations, . . . records, inspections/internal investigations and other services provided by other

22  county departments in support of the Chelan County Sheriff.

**ARTICLE IV**

4.1 Personnel:

23  4.2 The rendition of such services, the standards of performance, the discipline of officers, and other matters incident to the performance

24  of such services and the control of personnel so employed shall remain in the County.

25  4.3 Pursuant to RCW 41.14.250, and as a direct consequence of this agreement, city law enforcement employees who have met the

26  minimum standards and qualifications of the Sheriff's office, and successfully completed a background investigation, may transfer

27  employment to the county. All persons employed in the performance of such services and functions pursuant to this Agreement for said City

28  shall be County employees and no City employee shall transfer

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 3

employment to the County, unless required pursuant to RCW 41.14.250.

4.4 For the purpose of performing services and functions pursuant to this Agreement and only for the purpose of giving official status to the performance thereof, and not to establish an agency relationship, every County Deputy and employee engaged in performing any such service and function shall be deemed to be an officer of said City while performing service for said City, which service is within the scope of this Agreement and is a municipal function.

4.5 The level, degree and type of city services and the number of positions assigned to those services shall be determined by the Sheriff or his/her designee, after consultation with the City. . . . While the Sheriff controls the employees, standard of performance, discipline, and all other aspects of performance of the employees assigned to provide Law Enforcement Services, the City may submit comments thereon to the Sheriff.
. . .

**ARTICLE IX AGREEMENT ADMINISTRATION**

9.1 <u>Effective Date and Commencement of Services</u>.  This Agreement shall be effective upon execution by both parties.  The transition, described in Article XI, shall begin on the Effective Date.  The designation of the Police Chief of the City shall be the sergeant identified in section 2.4, and whose duties shall commence January 1, 2004.  The provision of the balance of law enforcement services and support services shall commence March 1, 2004.
. . .

**ARTICE XI TRANSITION**

11.1 The City and County shall work on and complete a mutually agreed-upon transition plan providing for an orderly transition of responsibilities from the City to the County.  The overarching goal of the transition plan will be to ensure there is not a disruption in service to the community as the providers change.  This plan would include desired outcomes, project phases (including a preliminary transition plan development) and timelines, and project roles and responsibilities.  Each party shall bear its respective costs in the transition and each identify and address the continuity of professional and quality police services before, during and through the transition period.
. . . .

(Ex. 18).  Pursuant to the LESA, CCSO Sergeant and Defendant Kent Sisson became Acting City Police Chief on January 1, 2004.

During his tenure as Acting Police Chief, Sgt. Sisson remained an employee of CCSO and reported to Sheriff Mike Harum.  He also consulted with City of Chelan Mayor Jay Witherbee.  Plaintiff avers that the City and CCSO shared duties and responsibilities for the acts of Sgt. Sisson, and that he was answerable to both entities.  However, the terms of the LESA as quoted above are that the management of personnel, which is the function contested here, was squarely a function of Sgt. Sisson as a County employee, and that the City's involvement in

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 4

1  this function was limited to submitting comments thereon.  (Ex. 18, §§ 4.2, 4.5).

2  On February 29, 2004, the City closed its Police Department and laid off all city

3  law enforcement employees, and, on March 1, 2004, CCSO assumed all law

4  enforcement services.

5      Plaintiff, along with most of the other City police officers, sought to transfer

6  her employment to CCSO before the dissolution of the City Police Department.

7  RCW §§ 41.14.250-41.14.270 govern the transfer of police department employees

8  when a city contracts to obtain sheriff's office law enforcement services.  The

9  relevant provisions state the following:

**41.14.250.  City contracts to obtain sheriff's office law enforcement services—Transfer of police department employees**

When any city or town shall contract with the county sheriff's office to obtain law enforcement services to the city or town, any employee of the police department of such city or town who (1) was at the time such contract was entered into employed exclusively or principally in performing the powers, duties, and functions which are to be performed by the county sheriff's office under such contract (2) will, as a direct consequence of such contract, be separated from the employ of the city or town, and (3) meets the minimum standards and qualifications of the county sheriff's office, then such employee may transfer his employment to the county sheriff's office as provided for in RCW 41.14.260 and 41.14.270.

**41.14.260.  City contracts to obtain sheriff's office law enforcement services—Transfer of police department employees into county civil service for sheriff's office—Seniority for employment**

(1) An eligible employee may transfer into the county civil service system for the sheriff's office by filing a written request with the county civil service commission and by giving written notice thereof to the legislative authority of the city or town.  Upon receipt of such request by the civil service commission the transfer of employment shall be made. . . .  The sheriff may appoint the transferring employee to whatever duties he feels are in the best interest of the department and the individual.

Rule 21 of the Chelan County Civil Service Commission Rules contains the

minimum standards and qualifications for employment as a Chelan County

Sheriff's Deputy.  Meeting these qualifications is a prerequisite of being

transferred pursuant to RCW § 41.14.250.  Rule 21 states the following:

**MINIMUM JOB REQUIREMENTS** . . .
1.      Graduation from standard high school, or GED, **PLUS**
        Two years of fully commissioned law enforcement experience –

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 5

. . .

2.     Ability to read and write the English language.

3.     United States Citizen, good physical condition, and not less than 21 years of age at the time of employment.

4.     Possession of a valid Washington State driver's license by date of hire.

5.     Ability to pass entrance examination successfully. Must meet minimum medical and health standards adopted by the Civil Service Commission.

6.     Applicant must have no felony convictions; be able to successfully pass a background investigation; and be able to obtain a concealed weapons permit.

7.     Once employed the applicant must successfully complete the Basic Law Enforcement Academy and successfully pass the Basic Law Enforcement physical agility admittance test.

8.     Once employed the applicant must meet all required certifications and maintain all other standards necessary for the performance of their job duties.

(Ex. 36).

The term "background investigation" is not defined or further elaborated in the rules, but Exhibit 22 describes the background investigation procedure used by CCSO employees. The procedure states that the officer conducting the investigation must obtain references from the applicant's current and past employers and inquire of the applicant's family, friends, and associates as to her character and reputation. (Ex. 22, at 1-2). The stated objectives of the investigation are to allow the Sheriff and Undersheriff "to form a view of the applicant's qualifications, experience, honesty, dependability, integrity, morality, emotional stability, reputation, associations, prejudice and loyalty[;]" and to ensure the employee has "good moral character." (Id.). Good moral character is defined as follows: "A prospective employee of good moral character would possess attributes to enhance his or her job performance, including honesty, integrity, obedience to the oath of office and the code of ethics, respect for authority and respect for the rights of others. Good moral character is determined by a favorable report following the comprehensive background investigation." (Id.).

///

I.    **Decision not to hire Plaintiff at CCSO**

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 6

1    Detective Mike Hartnett conducted a background investigation on Plaintiff
2  after she applied to CCSO.  Det. Hartnett's report includes a comparison of
3  Plaintiff's applications to CCSO (she applied initially in March 1999 and again in
4  December 2004) and an evaluation of her personnel file with the City Police
5  Department.  The report summarizes Det. Hartnett's interviews with most of
6  Plaintiff's co-workers and supervisors and one private citizen.  It also includes the
7  results of a polygraph test and Det. Hartnett's own evaluation of Plaintiff's fitness
8  to be employed by CCSO.  (Ex. 1).  Plaintiff asserts that the background
9  investigation omitted several critical considerations, including an interview with
10  Plaintiff's direct supervisor, Ben Rhines; personnel evaluations; a comparison of
11  cases worked by Plaintiff against the performance of other officers; and favorable
12  polygraph results.  Plaintiff also argues that the investigation was founded almost
13  entirely on "unchecked hearsay statements."

14    The interview summaries in the background investigation report indicate that
15  several of Plaintiff's co-workers thought she was weak at her patrol duties and
16  officer safety, although quite a few stated that this may be due to lack of
17  supervision and training.  A few officers reported inappropriate incidents such as
18  public intoxication and calling officers to serve as a "taxi service" for Plaintiff's
19  intoxicated friends.  Det. Hartnett also discovered that Plaintiff had used a City
20  police car and her uniform in a photograph she posted on an internet dating service
21  without permission.  Plaintiff's direct supervisor, Lt. Rhines, was asked for an
22  interview but did not acknowledge Det. Hartnett's request to meet.  The report
23  does include a review of Plaintiff's personnel file, including a disciplinary letter
24  written by Corporal Saul Gallegos in 2002 that outlined deficiencies in Plaintiff's
25  work habits and recommended corrective action.  Mr. Gallegos is now deceased,
26  and no corrective action was recorded in Plaintiff's file.  (Ex. 1).

27    Plaintiff received several compliments during Det. Hartnett's interviews as
28  well—Joseph Waldon said she responds well to medical emergencies and has good

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 7

contacts with the public; Doug Corulli stated she has "good follow-up" and does well with detective work; and Bob Mckellar said he enjoys working with Plaintiff, she is thorough in her investigation techniques, and she is knowledgeable in the area of search warrants and check fraud cases. These positive comments were included in the background investigation report. (Ex. 1, at 4-6). Mr. Mckellar's interview was the only one that did not include any negative comments, however. The overall impression from the background report, as reflected in Det. Hartnett's evaluation at its end, is negative. Hartnett recognizes that most of the incidents complained of occurred during 2002, and he was unaware whether her behavior had changed since then. Det. Hartnett stated:

> Based upon the overwhelming negative input from her co-workers and other references (with one exception) I would recommend that if she is considered for employment with this office she be enrolled in an intensive FTO [Field Training Officer] program . . . to include remedial training for basic police officer skills. It should be noted that I did not respond to rumors, rather I only included first hand knowledge of Bonnie's behavior, conduct, and abilities.

(Ex. 1, at 8).

After reviewing Det. Hartnett's report, Sheriff Mike Harum, the appointing authority for CCSO, determined Plaintiff did not pass the background investigation and would not be offered a position. Undersheriff Greg Meinzer informed her of this decision by letter dated January 16, 2004. It appears the City had no involvement in the background check or in Defendant Harum's decision not to hire Plaintiff as an employee of CCSO, although Plaintiff disagrees.[1]

Plaintiff had no opportunity to respond to the allegations contained in the

---

[1] Plaintiff groups Defendants CCSO and the City, along with the individual Defendants, together in much of her statement of facts. However, a review of the evidence shows that at no time were Detective Hartnett, Undersheriff Meinzer, or Sheriff Harum employed by the City nor did they consult with the City regarding the decision not to hire Plaintiff.

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 8

background check.  Plaintiff submits excerpts from depositions of Det. Hartnett and Eric Collier, another detective with CCSO, supporting her contention that the background investigation was "fixed".  Det. Collier stated in his deposition that in the fall of 2003 he heard Mark Mann, who was the Chief Criminal Deputy with CCSO at the time, say that "Bonnie Stearns wouldn't be hired."  Det. Collier also reported that it "was clear" that Deputy Mann's opinion that Plaintiff would fail the background investigation "had been discussed" with Sheriff Harum and "that there was, you know, no doubt that she was not going to be hired by the sheriff's office if we absorbed the City of Chelan."[2]  Det. Hartnett's deposition testimony also reflects that Deputy Mann made statements of this nature.  However, Det. Hartnett stated that he was never told that Plaintiff should not pass the background investigation.  The official decision that she had failed was not made until after the report was completed in January 2004.  Deputy Mann was not involved in the decision whether to hire Plaintiff as a CCSO deputy.

On March 3, 2004, an article appeared in the *Wenatchee World* in which it was reported that

> The Chelan County Sheriff's Office officially took over police duties this week for the city of Chelan, ending a nearly 50-year span of city-run law enforcement.
> The county hired four former Chelan police officers, assigning them to patrol the city.
> Two other Chelan police officers failed background checks required for employment, said sheriff's office Sgt. Kent Sisson, who is in charge of the new Chelan detachment.  Sisson would not say why the two officers, Kyle Watson and Bonnie Stearns, were not hired, other than to say that they did not meet the standards set by the sheriff's office.
> Stearns said Tuesday that she has hired an attorney and plans to appeal the decision.  She said the sheriff's office has not yet fully explained why she was not hired.
> Sisson said Watson has not appealed the decision and plans to seek law enforcement employment elsewhere.  Watson couldn't be reached for comment.

(Pl.'s Ex. B).

## II.   Decision to place Plaintiff on administrative leave

---

[2]  The admissibility of Det. Collier's statements is discussed, *infra*.

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 9

1    After Sgt. Sisson became acting Chief of Police for the City, he reviewed the

2   personnel files of the City's officers and became concerned about information in

3   Plaintiff's records about alleged department policy violations which had not been

4   investigated. As a result, Sgt. Sisson decided to conduct an internal investigation

5   of the allegations in Plaintiff's record and, on January 18, 2004, placed Plaintiff on

6   administrative leave with pay pending the investigation's results. Plaintiff alleges

7   that the decision to place her on paid administrative leave was a collective one

8   involving the City and CCSO. The City contends that pursuant to the LESA this

9   decision and all decisions on how to manage and/or discipline personnel were

10  Sisson's and, by extension, CCSO's. The terms of the LESA do give the County

11  exclusive control over personnel discipline and standards of performance. (Ex. 18,

12  § 4.2).

13    Plaintiff was a certified Civil Service employee with the City when she was

14  placed on paid administrative leave. The City of Chelan Civil Service Rules and

15  Regulations ("Civil Service Rules") state that "[t]he appointing authority or his/her

16  designee may suspend with pay during investigation . . . ." (Ex. 3, § 17.01.03).

17  Another provision of the Civil Service Rules states the appointing authority "may

18  suspend a subordinate, with or without pay, for a period not to exceed thirty (30)

19  working days for good cause." (Id. § 17.01.01). The Civil Service Rules further

20  state that the "Chief of Police or his/her designee shall provide and arrange for a

21  predisciplinary hearing prior to demotion, suspension, or discharge of a

22  subordinate." (Id. § 18.01). The requirements for a predisciplinary hearing under

23  the Civil Service Rules are as follows:

24  18.03.01    An employee shall be provided, in writing, with a notice of
            the charge and an explanation of the department's evidence.
25            The employee shall be given an opportunity to respond to
            the charges, orally or in writing, as to why the proposed
26            action should not be taken.
    18.03.03    The employee may have legal counsel present at a
27            predisciplinary hearing.
    18.03.05    The department's explanation of the department's evidence
28            at the predisciplinary hearing shall be sufficient to apprise

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 10

the employee of the basis for the proposed action. This rule, however, shall not be construed to limit the City at any subsequent hearing from presenting a more detailed and complete case, including presentation of witnesses and documents not available at the predisciplinary hearing.

18.03.07    Should the Chief of Police and/or the appointing authority determine to discipline following the predisciplinary procedure, written notice of discipline shall be given to the employee. Such notice shall include the charges against the employee and a general statement of the evidence supporting the charges. A duplicate of such statement shall be filed with the Commission.

18.03.09    The Commission shall not consider, on appeal, any basis for disciplinary action not previously presented to the employee.

(Id. § 18.03).

Sgt. Sisson informed Plaintiff that she was placed on paid administrative leave by letter and in a meeting on January 18, 2004. (Ex. 4 (written notice); Ex. 29 (memo regarding meeting)). The letter gave Plaintiff notice and explains the basis of Sgt. Sisson's decision to place her on paid administrative leave. (Ex. 4). Sgt. Sisson's memorandum about his meeting with Plaintiff, written on January 25, 2004, indicates that Plaintiff questioned him during their meeting about the basis for his decision, asking him "for a specific example of the alleged policy violations." (Ex. 29). Plaintiff and Sisson discussed several of the charges during the meeting, and Sgt. Sisson told her that she could contact him if and when she needed. Plaintiff told Sgt. Sisson that she did not have any further questions at that time. (Id.).

Before leaving the station, Plaintiff turned in her firearm and then became emotional before driving herself home. In his memorandum, Sgt. Sisson mentions that Plaintiff circulated a nine page e-mail that was her account of the meeting and events on January 18, 2004. (Id.). However, this e-mail was not included among the discovery materials submitted for these motions.

Sgt. Sisson and CCSO declare that he was following County procedures when he placed Plaintiff on paid administrative leave. The CCSO Policy and Procedure Manual permits "administrative leave" without any sort of hearing. (Ex.

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 11

54, § 1.05.21).  It states

> [a]t the Sheriff's discretion an employee may be placed on administrative leave or special assignment.  The purpose of such placement is to remove a deputy from duty temporarily following a traumatic incident or pending an inquiry or investigation or for other purposes as determined by the Sheriff.  This placement is not disciplinary in nature and does not affect property rights.  Those given such placement are under orders of the Sheriff regarding their conduct and availability for recall."

(Id.).  However, Sgt. Sisson and CCSO admit and maintain that Plaintiff was never an employee of CCSO, so the applicability of its rules and policies to her is questionable.

Plaintiff asserts that she was never given an opportunity to respond to the internal investigation initiated by Sgt. Sisson.  Defendant CCSO maintains that she was given an opportunity to discuss the investigation with Sgt. Sisson during the last week of February 2002, but she refused.  Defendant CCSO completed the investigation on March 2, 2004, after Plaintiff was terminated by the City.

Before her termination, Plaintiff was given the option to enter into a Severance and Release Agreement.  Plaintiff contends this is evidence of Defendants' intention to discharge Plaintiff when they placed her on administrative leave.  CCSO states there were two reasons it presented Plaintiff with the Severance and Release Agreement: (1) to attempt to avert this law suit; and (2) to conclude the internal investigation before official findings were made to potentially assist Plaintiff's future attempts to secure employment.  The Severance and Release Agreement identifies both the City and Chelan County as the "Employer[s]."  (Ex. 19).

## DISCUSSION

## I.    Defendant City of Chelan's Motion for Summary Judgment

The City of Chelan requests summary judgment on all claims on several bases.  First, the City asserts that it cannot be liable for a violation of 42 U.S.C. § 1983 under the doctrine of *respondeat superior*.  Second, the City submits there is no evidence of participation by City officials in Chelan County's decision not to

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 12

hire Plaintiff.  Third, Plaintiff's remaining theories against the City arise out of the conduct of CCSO personnel, for whom the City is not vicariously liable.  Plaintiff responds that this motion must be denied because Sgt. Sisson was a dual agent/employee of the City and CCSO, and he was acting on official City policy with respect to Plaintiff's suspension and de facto termination.  The City is correct in its statement that all Plaintiff's claims are directed toward the City through the actions of the individual Defendants.[3]

**A.    Section 1983 and *Respondeat Superior***

The Supreme Court in *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 689-90 (1978), and later cases held that municipalities and other local governmental bodies are "persons" and thus may be held liable under § 1983.  The Court also examined the legislative history of § 1983, and determined that a municipality may not be held liable under § 1983 "*solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id*. at 691 (emphasis in original).  Liability will

---

[3]  Plaintiff's first cause of action for Breach of Contract/Civil Service Rules states "Defendants Harum, Meinzer and Sisson failed to comply with . . . ."  (Am. Compl. ¶ 4.2).  Plaintiff's second cause of action for Violation of RCW 41.14.250-270 states "Harum, Meinzer and Sisson individually and collectively denied Groseclose's request for transfer in violation of . . . ."  (Id. ¶ 5.4).  Plaintiff's third cause of action for Defamation states "Defendants, through the acts of Harum, Meinzer and Sisson, defamed Groseclose's reputation . . . ."  (Id. ¶ 6.2).  Plaintiff's fourth cause of action for Constitutional Violations states "Defendants, through the acts of Harum, Meinzer and Sisson, violated Groseclose's state and federal constitutional rights . . . ."  (Id. ¶ 7.2).  Plaintiff's fifth and last cause of action for Discrimination Based on Sex/Gender states "Groseclose was terminated based upon her gender in violation of . . . ."  (Id. ¶ 8.3).

1  be imposed on a government that "under color of some official policy, 'causes' an

2  employee to violate another's constitutional rights." *Id*. at 692.

3      The Court has refined this holding through later cases addressing the issue of

4  municipal liability under § 1983. In 1986, the Court held that "municipal liability

5  under § 1983 attaches where—and only where—a deliberate choice to follow a

6  course of action is made from among various alternatives by the official or officials

7  responsible for establishing final policy with respect to the subject matter in

8  question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). More

9  recently, the Court explained its reasoning further:

10     [I]n *Monell* and subsequent cases, we have required a plaintiff seeking
   to impose liability on a municipality under § 1983 to identify a municipal
11 "policy" or "custom" that caused the plaintiff's injury. Locating a
   "policy" ensures that a municipality is held liable only for those
12 deprivations resulting from the decisions of its duly constituted
   legislative body or of those officials whose acts may fairly be said to be
13 those of the municipality. Similarly, an act performed pursuant to a
   "custom" that has not been formally approved by an appropriate decision
14 maker may fairly subject a municipality to liability on the theory that the
   relevant practice is so widespread as to have the force of law.
15 . . .
   [I]t is not enough for a § 1983 plaintiff merely to identify conduct
16 properly attributable to the municipality. The plaintiff must also
   demonstrate that, through its *deliberate* conduct, the municipality was
17 the "moving force" behind the injury alleged. That is, a plaintiff must
   show that the municipal action was taken with the requisite degree of
18 culpability and must demonstrate a direct causal link between the
   municipal action and the deprivation of federal rights.

19 *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403-04

20 (1997) (emphasis in original) (internal citations omitted).

21     Here, Plaintiff must establish that the City had a relevant and deliberate

22 policy or custom and that this policy or custom was the proximate cause of her

23 injuries. In her Response Brief and Motion for Summary Judgment, Plaintiff does

24 not allege a City policy or custom that resulted in CCSO's decision not to hire her,

25 nor does she allege a City policy or custom that was responsible for her being

26 suspended pending the results of an internal investigation. It appears Plaintiff

27 relies solely on the theory of vicarious liability or *respondeat superior*, which, as

28

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 14

explained above, does not create liability for a municipality.  Accordingly, Plaintiff's § 1983 claims against the City are dismissed.

In her Reply Memorandum, Plaintiff raises for the first time the theory that the City failed to adequately train Sgt. Sisson on relevant issues, which imputes municipal liability under § 1983 under *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).  The City objects to Plaintiff's untimely assertion of this theory of liability in its Motion to Strike Reply Memorandum on the grounds that it is improper for a party to introduce new legal arguments in a reply brief other than those presented in the preceding materials.  The City cites to *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894-95 (1990), in support of its argument.  The City asks the Court to strike Plaintiff's reply or, in the alternative, to permit it to file a sur-reply.

Plaintiff's failure to properly train theory is unsupported by the evidence.  A municipality has § 1983 liability only when the claimant's constitutional deprivation was the result of an official policy or custom.  In *Harris*, the Supreme Court explained that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. at 389. Plaintiff has failed to allege that the City's training policy, or even its specific action of appointing Sgt. Sisson as Acting Chief of Police without providing additional training, amounted to a deliberate indifference of her rights or the rights of other employees or citizens with whom he came into contact.  Therefore, this theory does not create a genuine issue of material fact, and Plaintiff's § 1983 claim against the City is dismissed.

**B.    Is the City liable for the acts of Harum, Meinzer, or Sisson?**

The remainder of Plaintiff's claims depend upon the establishment of a relationship between the individual Defendants and the City.  *See supra* n.3.  The City asserts that it had no connection in any way to Harum or Meinzer and that they remained employees of CCSO throughout the contested time period.  The bulk of Plaintiff's claims against the City therefore rest upon the City's relationship with Sgt. Sisson.  If he qualifies as an employee or agent of the City, then his actions may be imputed to it under the theory of *respondeat superior*.

The actions and claims in which Sgt. Sisson allegedly played a part include Plaintiff's Breach of Civil Service Rules claim, her Defamation claim, and her Constitutional Violations claim.  As discussed above, however, the City cannot be held liable on a theory of vicarious liability for Plaintiff's constitutional claims brought pursuant to § 1983.

Vicarious liability or *respondeat superior* is a theory by which a claimant may impute liability for the negligent acts of a servant to his master.  *See McLean v. St. Regis Paper Co.*, 6 Wash. App. 727, 729-30 (1972).  When determining whether an employment relationship creates vicarious liability, federal courts look to principles of state law.  *See Carroll v. Fed. Express Corp.*, 113 F.3d 163, 165 n.1 (9th Cir. 1997) (stating that the court looks "to principles of California law to determine whether Federal Express is vicariously liable for the actions of its independent contractor").

There are two types of legal relationship that generally may exist and that are involved in this case: servant and independent contractor.  Washington courts have applied the factors outlined in the *Restatement (Second) of Agency* § 220 (1958), to determine whether one acting for another is a servant or an independent contractor.  *Massey v. Tube Art Display, Inc.*, 15 Wash. App. 782, 786 (1976).  These factors are as follows:

(a) the extent of control which, by the agreement, the master may

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 16

exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relation of master and servant; and
(j) whether the principal is or is not in business.

*Id*. at 786-87.  These factors are of varying importance in determining whether the actor is a servant or an independent contractor, and the element of control is the only necessary element for a master-servant relationship to be formed.  *Id*. at 787.  "It is the right to control another's physical conduct that is the essential and oftentimes decisive factor in establishing vicarious liability where the person controlled is a servant or a nonservant agent."  *Id*.

"If the evidence conflicts regarding the relationship between the parties at the time of the injury or if it is reasonably susceptible of more than one inference, then the question [of vicarious liability] is one of fact for the jury.  If the evidence is undisputed, the question is one of law and left to the court for its determination."  *Chapman v. Black*, 49 Wash. App. 94, 99 (1987).  Here, the employment relationship between the City and Sgt. Sisson was governed and defined entirely in the LESA, so it is a question of law.

Under the LESA, Sgt. Sisson was designated Acting Police Chief, but he remained an employee of CCSO.  He reported to Sheriff Harum and received his paychecks and benefits from Chelan County.  In the provision of law enforcement services and in the making of personnel decisions, the LESA is very clear that the County, and vicariously Sgt. Sisson, were in control.  The City and Mayor Witherbee retained the right to comment on and inquire into Sgt. Sisson's actions

1  and decisions, but this does not mean Sgt. Sisson was a servant of the City. "The

2  retention of the right to inspect and supervise and to insure the proper completion

3  of the contract . . . does not vitiate the independent contractor relationship." *Id.*

4  Under the terms of the LESA and considering the evidence provided, Sgt. Sisson

5  was an independent contractor for the City. Therefore, the City is not vicariously

6  liable for Sgt. Sisson's actions.

7        Plaintiff raises two other theories of liability: joint venture and loaned

8  servant. "Joint venture members are vicariously liable for each other's acts, such

9  liability being founded on the voluntary relationship that has arisen between the

10  parties." *Adams v. Johnston*, 71 Wash. App. 599, 610-11 (1993). Joint ventures

11  arise by contract, and they do not arise unless there is "(a) a common purpose and

12  intention to act as joint venturers; (b) a community of interest, and (c) an equal

13  right to a voice accompanied by an equal right of control." *Id.* at 611. Here, the

14  LESA specified that the County had complete responsibility for compensating and

15  supervising personnel once the transition period ended. Between January 1, 2004,

16  and February 29, 2004, during the transition period, the County also had complete

17  control over the activities of the City Police Department. Therefore, neither CCSO

18  nor Sgt. Sisson entered a joint venture with the City.

19        A "loaned servant" is legally similar to a "servant" under the above analysis.

20  It is simply a different term used in the worker's compensation context. Just as in

21  the servant/independent contractor analysis, the primary consideration when

22  determining if a person is a loaned servant is the power of supervision and control.

23  *Jones v. Halvorson-Berg*, 69 Wash. App. 117, 121 (1993). The City did not have

24  supervision or control over Sgt. Sisson's actions, so even if the loaned servant

25  determination controlled in this case, Sgt. Sisson does not qualify as the City's

26  loaned servant.

27        Consequently, the City is not vicariously liable for Sgt. Sisson's actions or

28  decisions regarding Plaintiff's placement on administrative leave, nor was it

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 18

1  responsible or connected in any way to CCSO's decision not to hire her.

2  Therefore, there is no genuine issue of material fact as to the remaining claims

3  against the City, and the City's motion for summary judgment is granted.

4  **II.    Defendants CCSO and Individuals' Motion for Summary Judgment**

5        Defendants CCSO and the named individual Defendants, Mike Harum, Greg

6  Meinzer, and Kent Sisson (together "County Defendants"), jointly filed a motion

7  for summary judgment (Ct. Rec. 33).  The Court first addresses Plaintiff's breach

8  of contract claim, her first cause of action.  Plaintiff's second, third, and fifth

9  causes of action for violation of RCW 41.14.250-.270, defamation, and

10  discrimination based on gender all rely at least partially on the validity of the

11  background investigation conducted by CCSO.  These claims are addressed

12  together.  Plaintiff's constitutional claims under § 1983 require independent

13  analysis.

14        **A.    Breach of Contract/Civil Service Rules Claim**

15        In her complaint, Plaintiff claims that Defendants Harum, Meinzer, and

16  Sisson failed to comply with and follow the appropriate procedures under either

17  Chelan County Sheriff's Office or City of Chelan Civil Service and other rules in

18  suspending and ultimately terminating her.  County Defendants counter that

19  Plaintiff was not in contractual privity with them, and that this is a prerequisite to

20  her claim of breach of contract.  Plaintiff claims that CCSO is vicariously liable for

21  Sisson's decision to investigate Ms. Groseclose and place her on administrative

22  leave and for Sheriff Harum's decision not to hire Plaintiff.

23        Washington courts have consistently held that the terms and conditions of

24  public employment do not give rise to contractual rights of any form.  *Wash. Fed'n*

25  *of State Employees v. State*, 101 Wash.2d 536, 541-42 (1984); *Weber v. State*, 78

26  Wash. App. 607, 610 (1995); *Grieg v. Metzler*, 33 Wash. App. 223, 230 (1982).

27  Civil service employment is controlled by the civil service statutes, subject to

28  Washington Constitution Article 1, Section 23.  *State Employees*, 101 Wash.2d at

542; *Riccobono v. Pierce County*, 92 Wash. App. 254, 263 (1998). In other words, "civil service employment is grounded on a contract of employment formed between the public employer and the employee, but . . . the contract incorporates, as implied and controlling terms, the civil service statutes as now existing or hereafter amended, subject to Washington Constitution Article 1, Section 23." *Riccobono*, 92 Wash. App. at 264 n.25.

The Washington Legislature intended that the statutes and regulations regarding civil service be the exclusive remedy for breach. *Id*. at 263-64; *Reninger v. State*, 79 Wash. App. 623, 632 (explaining "the Legislature intended that a civil service employee utilize [civil service remedies] before gaining access to the superior court for additional remedies"). Therefore, "a claimant suing for breach of an employment relationship controlled by the civil service statutes and regulations must exhaust the procedures and remedies set forth therein." *Riccobono*, 92 Wash. App. at 264. An exception to the exhaustion requirement exists for wrongful discharge as against public policy and employment discrimination and retaliation claims (see discussion, *infra*). *Id*. However these exceptions do not apply to Plaintiff's breach of contract claim.

Plaintiff has not submitted any evidence showing that she has exhausted her civil service remedies regarding either her alleged wrongful suspension or "termination." Accordingly, this claim is dismissed.

### B.    Plaintiff's Background Investigation

Plaintiff's remaining claims all relate and partially depend upon the validity of Sheriff Harum's decision that Plaintiff failed her background investigation. Plaintiff's claim that County Defendants violated RCW 41.14.250-.270 depends on whether she was eligible for transfer to the county, and her eligibility depends on her passing the background investigation. Plaintiff's defamation claim depends partially on the truth or falsity of Defendant Sisson's statement that she failed her background investigation. Additionally, Plaintiff's gender discrimination claim

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 20

also depends on the validity of Sheriff Harum's decision because her failure of the background investigation is offered as the County Defendants' legitimate, non-discriminatory reason for their decision not to hire her.

CCSO's policy and procedure manual includes the procedures followed when it conducts a background investigation of potential employees.  Although the eventual determination of whether an applicant has "good moral character" is certainly at least partially subjective, the investigation also includes many objective components, including a polygraph test, a review of the accuracy of the application, and a review of the applicant's personnel file.  Passing the background investigation is an established requirement for employment with CCSO, and it is included in Rule 21 and in the LESA.

Additionally, RCW § 41.14.260(1) states that "[a]n *eligible* employee may transfer into the county civil service system for the sheriff's office . . . ." (emphasis added).  An eligible employee must meet "(3) . . . the minimum standards and qualifications of the county sheriff's office . . . ."  RCW § 41.14.250.  The Washington Supreme Court has considered these provisions and found that

> [t]he plain language of these statutes indicates city law enforcement employees do not have an unconditional right to transfer their employment, but must first meet the County's minimum employment standards and qualifications.  The County therefore has the right to . . . refuse employment to those who may have met the City's standards, but do not meet the County's.  To interpret the transfer statutes otherwise would render the third eligibility requirement in RCW 41.14.250 meaningless.

*Stone v. Chelan County Sheriff's Dep't*, 110 Wash.2d 806, 810 (1988).

Plaintiff points to Deputy Mann's statements that she would fail the background investigation, as reported by Det. Collier and Det. Hartnett, as evidence that it was rigged against her passage.  Deputy Mann's statements could be relevant to two material issues of fact regarding the validity of the background investigation: (1) to show their effect on Det. Hartnett as he conducted Plaintiff's background investigation, and/or (2) to show that they originated with or influenced Sheriff Harum, the officer who made the decision that Plaintiff failed

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 21

1    her background investigation.

2        Det. Hartnett's deposition testimony clearly states that he was not affected or

3    influenced by Deputy Mann's comments or told by anyone how he should conduct

4    Plaintiff's background investigation, and there is no additional circumstantial

5    evidence supporting the conclusion that these statements or anything else

6    influenced his compilation of Plaintiff's background investigation report.

7    Consequently, the hearsay statements of Deputy Mann, as reported by Det.

8    Hartnett and Det. Collier, do not create a genuine issue of material fact as to their

9    influence on Det. Hartnett's conduct.

10        Nevertheless, Det. Collier's deposition testimony could create a genuine

11    issue of material fact as to the legitimacy of Sheriff Harum's decision that Plaintiff

12    failed her background investigation.  The Court must initially consider whether

13    Det. Collier's account of the statements made by Deputy Mann, including Det.

14    Collier's impressions regarding where those statements originated, are admissible

15    under the Federal Rules of Evidence.  *See* Fed. R. Civ. P. 56(e) ("Supporting and

16    opposing affidavits shall be made on personal knowledge, [and] shall set forth such

17    facts as would be admissible in evidence. . . .").

18        Deputy Mann's statements as reported by Det. Collier are hearsay, for they

19    are out of court statements offered "to prove the truth of the matter asserted."  Fed.

20    R. Evid. 801(c).  Plaintiff is offering these statements to prove that Plaintiff could

21    not pass her background investigation even before the investigation was conducted.

22    These statements could be admissible as an admission by a party-opponent.  Rule

23    801(d)(2)(D) renders admissible statements by a party's agent or servant

24    "concerning a matter within the scope of the agency or employment, made during

25    the existence of the relationship[.]" *Id.* 801(d)(2)(D).  The Court need not reach

26    this question, however.  The statements are admissible at the summary judgment

27    stage because they "could be presented in an admissible form at trial" through the

28    testimony of Deputy Mann himself.  *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 22

Cir. 2003), *cert. denied sub nom. U.S. Bancorp v. Fraser*, 541 U.S. 937 (2004).
Deputy Mann's statements do not create a genuine issue of material fact absent
additional circumstantial evidence, however. As with Det. Hartnett above, these
statements alone do not imply that Sheriff Harum's decision was improperly
influenced or made before the investigation was completed.

Det. Collier's impressions regarding the origin of Deputy Mann's statements
could create a genuine issue. The following exchange took place at the deposition:

> Q:   Did [Deputy Mann] mention anybody else as far as having that
>      opinion?
> A:   It was clear that it came from Sheriff Harum.
> Q:   And how was that clear?
> A:   Just the way he presented it. That it had been discussed and that
>      there was, you know, no doubt that [Plaintiff] was not going to be
>      hired by the sheriff's office if we absorbed the City of Chelan.

Under Rule 701, opinion testimony by lay witnesses is admissible if the opinion or
inference is "(a) rationally based on the perception of the witness, [and] (b) helpful
to a clear understanding of the witness' testimony or the determination of a fact in
issue[.]" Fed. R. Evid. 701. Det. Collier testified in his deposition about
statements made to him personally, so the first requirement of Rule 701 is satisfied.
*United States v. Simas*, 937 F.2d 439, 464-65 (9th Cir. 1991). "As to the second
requirement, a lay witness' opinion concerning the witness' understanding of the
declarant's statements or conduct may be helpful to the jury. *Id.* at 465.
Accordingly, Det. Collier's deposition testimony concerning Deputy Mann's
statements and his impressions that they were attributable to Sheriff Harum is
admissible under Rule 701 and relevant to a material fact.

Det. Collier's impressions create a genuine issue of material fact as to the
fairness and objectivity of Sheriff Harum's decision that Plaintiff failed her
background investigation. Sheriff Harum asserts in a declaration that he "did not
make the decision that Bonnie Stearns had failed her background investigation
until after the report was completed by Detective Mike Hartnett." This simply
illustrates that a genuine issue of material fact exists, and that summary judgment

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 23

is not appropriate for Plaintiff's claims, listed above, that depend at least in part on the validity of Sheriff Harum's decision that Plaintiff failed her background investigation.

The Court does not find that Plaintiff necessarily passed her background investigation. However, the only evidence that Plaintiff failed her background investigation is Sheriff Harum's statement regarding his decision that she did. Det. Collier's impressions that this decision was made before the investigation was conducted creates a genuine issue of material fact as to the reasons behind Sheriff Harum's decision. A reasonable jury could find that Sheriff Harum decided Plaintiff failed the background investigation after reviewing Det. Hartnett's report. A jury could also find Sheriff Harum decided Plaintiff failed the background investigation before it was conducted, but for legitimate reasons. Perhaps Sheriff Harum was familiar with Plaintiff and knew about some of her issues as an employee of the City, and he realized that those issues precluded her passage of the background investigation. However, a reasonable jury could find that Sheriff Harum made the decision before the background investigation was conducted for illegitimate reasons, such as gender bias, and that he used Plaintiff's failure of the background investigation as a pretext for an otherwise unlawful employment decision. Consequently, a genuine issue of fact as to Sheriff Harum's decision exists, and summary judgment is not appropriate for those claims listed above in which the background investigation plays a significant part.

**C.    Constitutional Claims**

Plaintiff raises constitutional claims under 42 U.S.C. § 1983 and *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538 (1985). County Defendants dispute these claims on several bases. Initially, they assert there is no valid claim for punitive damages. They also maintain that no constitutional violation under § 1983 can be shown, nor was there a *Loudermill* violation. Lastly, the County Defendants submit that the individually named Defendants are protected by

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 24

1  qualified immunity.  In her response, Plaintiff asserts she was deprived of a

2  property interest without due process in that she had no meaningful notice or

3  opportunity to respond to allegations contained in her background investigation

4  report or in the internal investigation.  Plaintiff also contends she was deprived of

5  liberty interests without due process in that her suspension and "termination"

6  called into question her good name and reputation, and she was given no name-

7  clearing hearing.

### i.  Punitive Damages

9  Initially, the County Defendants state they are entitled to dismissal of

10  Plaintiff's claim for punitive damages.  Punitive damages cannot be imposed

11  against a county in a § 1983 suit.  *City of Newport v. Fact Concerts, Inc.*, 453 U.S.

12  247, 267 (1981).  The individual Defendants were sued both in their official and

13  individual capacities, for Plaintiff's Amended Complaint states "[a]ll acts or

14  omissions by [individual Defendant Sisson, Meinzer, or Harum] . . . were under

15  color of law . . . ."  A suit against an officer in his official capacity is the functional

16  equivalent to a suit against the governmental entity itself.  *Mitchell v. Dupnik*, 75

17  F.3d 517, 527 (9th Cir. 1996).  Therefore, punitive damages may only be sought

18  from the individual Defendants in this case if and when they were acting in their

19  individual capacities, and Plaintiff's punitive damages claim against the County is

20  dismissed.

### ii.    42 U.S.C. § 1983

22  To establish liability under § 1983,[4] Plaintiff bears the burden of proving

24  [4] Every person who, under color of any statute, ordinance, regulation,

25  custom, or usage, of any State or Territory, subjects or causes to be subjected, any

26  citizen of the United States or other person within the jurisdiction thereof to the

27  deprivation of any rights, privileges, or immunities secured by the Constitution and

28  laws, shall be liable to the party injured in any action at law, suit in equity, or other

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 25

that Defendants:  (1) acted under color of state law, and (2) deprived Plaintiff of rights secured by the Constitution or federal statutes.  42 U.S.C. § 1983; *Martinez v. City of Oxnard*, 270 F.3d 852, 855 (9th Cir. 2001).  Here, all Defendants are municipalities or employees of municipalities, so Plaintiff has satisfied her burden of establishing the first requirement.  Plaintiff alleges Defendants violated her due process rights by depriving her of both liberty and property interests without according her due process.

### a.    Plaintiff's Property Interests

"A state cannot deprive a person of property without according her due process.  U.S. Const. amend. XIV.  A property entitlement, such as that of continued employment in a state job, is grounded in state law." *Rea v. Matteucci*, 121 F.3d 483, 484 (9th Cir. 1997) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982)).  In *Stone v. Chelan County Sheriff's Department*, the Washington Supreme Court considered RCW 41.14.250-.270 and the rights those provisions give to employees seeking transfer to a county sheriff's office.  The Court determined that "these statutes do not grant city employees an absolute right to employment with the County."  *Stone*, 110 Wash.2d at 809.  However, employees who are eligible to transfer under RCW 41.14.250, *i.e.*, those who are employed by the city, will be terminated as a result of the contract, and meet the minimum standards and qualifications of the county sheriff's office, do have a property right in their continued employment.  RCW 41.14.260 states that "[a]n eligible employee may transfer . . . by filing a written request. . . .  Upon receipt of such request by the civil service commission the transfer of employment *shall be made*."  RCW 41.14.260 (emphasis added).  Viewing the pleadings in a light most favorable to Plaintiff, the Court must assume she met the minimum standards and qualifications of employment with CCSO.  *See* Section II.B. *supra*.  Therefore,

proper proceeding for redress. 42 U.S.C. § 1983.

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 26

1  Plaintiff had a property entitlement to continued employment after CCSO took

2  over the provision of law enforcement services pursuant to the LESA.

3      As a civil service employee of the City, Plaintiff also had a property

4  entitlement to her continued employment with the City until the dissolution of the

5  police department on February 29, 2004.  *See Loudermill*, 470 U.S. at 546.  "While

6  property interests are created and defined by existing rules or understandings that

7  stem from independent sources such as state law, minimum procedural protections

8  of those interests are matters of federal law."  *Danielson v. City of Seattle*, 108

9  Wash.2d 788, 795 (1987).  Plaintiff claims that placing her on paid administrative

10 leave without notice or hearing violated her due process rights.  She also appears to

11 raise a *de facto* or constructive discharge claim, maintaining that Sgt. Sisson never

12 intended to reinstate her once placing her on administrative leave.  County

13 Defendants state that suspension with pay does not implicate the due process

14 clause, and submit that if Plaintiff was deprived of a protected interest, such

15 deprivation did not constitute a due process violation.

16     The U.S. Supreme Court in *Loudermill* suggested that suspension with pay

17 would not raise due process concerns.  470 U.S. at 544-45 (stating that a due

18 process violation arising from an employer's inability to keep an employee at work

19 to afford him an opportunity to respond prior to termination due to "significant

20 hazards" could be avoided by "suspending with pay"); *see also Hicks v. City of*

21 *Watonga, Okla.*, 942 F.2d 737, 746 n.4 (10th Cir. 1991) ("Suspension with pay

22 does not raise due process concerns"); *Pitts v. Bd. of Educ. of U.S.D. 305, Salina,*

23 *Kansas*, 869 F.2d 555, 556 (10th Cir. 1989) (suspension of public employee with

24 pay does not infringe any measurable property interest).  Here, Plaintiff maintained

25 all her benefits until her employment was terminated lawfully on February 29,

26 2004.  Therefore, it appears her suspension with pay does not implicate the Due

27 Process Clause of the Fourteenth Amendment.

28     During and after her suspension, Plaintiff asserts that she was not offered an

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 27

opportunity to respond to the charges resulting from Sgt. Sisson's internal investigation, and that this violated her due process rights.  Defendants maintain that they offered Plaintiff an opportunity to respond, but that Plaintiff declined. Taking Plaintiff's assertion as true, Plaintiff's due process rights were not violated. As explained above, suspension with pay does not implicate due process concerns, and Plaintiff failed to take advantage of the civil service hearings that were available under City policy upon request.  Therefore, Plaintiff's § 1983 claim based on the deprivation of her property interest when she was placed on administrative leave without due process fails.

Plaintiff also contends that her suspension with pay amounted to *de facto* or constructive discharge, and she points to the Severance and Release Agreement as evidence that Defendants never intended to allow her back on the job before CCSO took over law enforcement for the City.  A claimant is not required to exhaust the administrative remedies for a wrongful constructive discharge claim because the civil service commission has no clearly established mechanisms for resolving claims for wrongful constructive discharge.  *Allstot v. Edwards*, 116 Wash.App. 424, 433 (2003).  "To establish a claim for constructive discharge, a claimant must show: (1) that the employer deliberately made the working conditions intolerable for the claimant; (2) that a reasonable person in the claimant's position would be forced to resign; (3) that the claimant resigned solely because of the intolerable conditions; and (4) that the claimant suffered damages."  *Id.* (internal citation omitted).  Here, Plaintiff has not carried this burden.  The Court finds that a reasonable person in Plaintiff's position, on paid administrative leave pending the results of an internal investigation, would not be forced to resign, just as Plaintiff did not resign.  Plaintiff has presented no evidence in support of a wrongful discharge claim aside from the Severance and Release Agreement, and the Agreement by itself is not sufficient.

Lastly, Plaintiff asserts that County Defendants violated her rights under

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 28

1   *Loudermill*.  In *Loudermill*, the U.S. Supreme Court held that public employees

2   with tenure were entitled to a pretermination hearing.  470 U.S. at 538.  Here,

3   Plaintiff was not tenured or employed with CCSO; instead, CCSO decided not to

4   hire Plaintiff.  *See Stone*, 110 Wash.2d at 811 (holding that those applying to

5   transfer to the county were "applying for employment").  Plaintiff has created a

6   genuine issue of material fact as to the existence of a property interest in her future

7   employment with CCSO, however.  The Supreme Court has held that a legislative

8   restructuring of the law enforcement departments resulting in termination provides

9   sufficient due process.  *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432-33

10  (1982) (explaining that when a legislative body deprives a claimant of a property

11  interest, "the legislative determination provides all the process that is due").

12  Nonetheless, the issue of material fact as to Plaintiff's property interest in her

13  employment dictates that a dismissal of her *Loudermill* claim at this stage would be

14  inappropriate.

15      Accordingly, Plaintiff's § 1983 claim based on deprivation of property

16  interests without due process is partially dismissed.  Plaintiff had a cognizable

17  property interest in employment with CCSO, so her § 1983 claims based on

18  deprivation of that property interest without due process and on *Loudermill* are

19  retained, subject to the qualified immunity analysis below.  However, paid

20  administrative leave does not require a pre-disciplinary hearing, so this portion of

21  Plaintiff's § 1983 claim is dismissed.[5]

22

23      [5] The Court does not analyze Plaintiff's due process claim under

24  Washington's Constitution because

25      [t]he constitutional guaranty of due process, Const. art. 1, § 3, does not
        of itself, without the aid of augmenting legislation, establish a cause of
26      action for money damages against the state in favor of any person
        alleging deprivation of property without due process.  This reasoning is
27      equally applicable to both state and municipal entities.

28  *Spurrell v. Bloch*, 40 Wash. App. 854, 862 (1985), *review denied* 104 Wash.2d

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 29

### b.    Plaintiff's Liberty Interests

Plaintiff also claims County Defendants violated the Due Process Clause by depriving her of liberty interests without due process.  The Ninth Circuit has held:

> injury to reputation standing alone does not violate the Due Process Clause of the Fourteenth Amendment; one's "interest in reputation" standing along "is neither 'liberty' nor 'property' guaranteed against state deprivation without due process of law."  Rather, due process protections apply only if a plaintiff is subjected to "'stigma plus'; i.e., if the state makes a charge against [a plaintiff] that might seriously damage his standing and associations in the community," and "1) the accuracy of the charge is contested, 2) there is some public disclosure of the charge, and 3) it is made in connection with the termination of employment or the alteration of some right or status recognized by state law."

*Wenger v. Monroe*, 282 F.3d 1068, 1074 (9th Cir. 2002) (as amended on denial of rehearing and rehearing *en banc*) (internal citations omitted).

Here, Plaintiff claims that County Defendants' decision not to hire her based on her failing the background investigation and the internal investigation deprived her of liberty interests in that they amounted to a discharge which called into question Plaintiff's "integrity and good name without opportunity to be heard."

Applying the test outlined above to Plaintiff's claims of a deprivation of liberty interests, it appears her claim satisfies the "stigma plus" burden.  Plaintiff has shown that the "charge" made against her, that she did not pass her background investigation, might seriously damage her standing in the community.  "Charges that carry the stigma of moral turpitude such as dishonesty or immorality may implicate a liberty interest, but charges of incompetence or inability to get along with others do not."  *Portman v. County of Santa Clara*, 995 F.2d 898, 907 (9th Cir. 1993).  Failing a background investigation carries the stigma of moral turpitude, and it could create a "false or defamatory impression[.]" *Codd v. Velger*, 429 U.S. 624, 628 (1977).  Additionally, the accuracy of the charge is contested, and it was publicly disclosed in the article in the *Wenatchee World*.  Lastly, the

---

1014 (1985).

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 30

1   charge was made in connection with the termination of employment.

2       Washington courts have also considered the question of whether a

3   claimant's liberty interests are necessarily implicated by the manner of termination.

4   *McGuire v. State*, 58 Wash.App. 195, 197 (1990).  In *McGuire*, the Washington

5   Court of Appeals considered whether summary judgment was appropriately

6   granted to the State Gambling Commission for a plaintiff's claim that his discharge

7   after an internal investigation into his history of playing golf with licensees.  *Id*. at

8   196.  The court noted that "[a] liberty interest is infringed if the government either

9   (1) imposes a stigma and thereby forecloses the employee's freedom to obtain

10  other employment or (2) dismisses an employee on grounds that call into question

11  his or her integrity, honor, or good name in the community."  *Id*. at 199.

12      The plaintiff in *McGuire* alleged his liberty interests were infringed by his

13  supervisor's statement to members of the Seattle office of the Gambling

14  Commission that he was discharged for reasons other than playing golf.  *Id*.  The

15  court upheld the superior court's grant of summary judgment because the plaintiff

16  "makes only assertions that his reputation was damaged and that law enforcement

17  agencies are suspicious of applicants who have been terminated by other agencies.

18  The record is devoid of any evidence that he was deprived of other employment

19  opportunities as a result of a reputation damaged by [his supervisor's] comment."

20  *Id*. at 200.

21      Here, Plaintiff states she has contacted law enforcement agencies for

22  employment in central Washington, and that they told her they were unwilling to

23  consider hiring her due to the circumstances surrounding her "termination."

24  Plaintiff has established a genuine issue of material fact as to whether her future

25  job prospects in central Washington were damaged by the statement that she failed

26  her background investigation.  As the Washington Supreme Court has noted,

27  "[n]early any reason assigned for dismissal is likely to have some negative

28  reflection on an individual.  However, not every dismissal assumes a constitutional

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 31

magnitude." *Jordan v. City of Oakville*, 106 Wash.2d 122, 131 (1986).  Plaintiff
has shown a genuine issue of material fact exists regarding the reason assigned her
dismissal; thus dismissal of her § 1983 claim for deprivation of a liberty interest
without due process through summary judgment is inappropriate.

### iii.    Qualified Immunity

County Defendants claim the individual Defendants are protected by
qualified immunity.  Here, it is not disputed that the individual Defendants were
acting under the color of state law.  It is well established, nonetheless, that police
officers are entitled to qualified immunity to shield them "from liability from civil
damages insofar as their conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have known."  *Harlow v.
Fitzgerald*, 457 U.S. 800, 818 (1982).

In determining whether the individual Defendants have qualified immunity,
the Court must first determine whether Plaintiff has stated a *prima facie* claim that
the individual Defendants violated one of her constitutional rights.  *Saucier v. Katz*,
533 U.S. 194, 198 (2001); *Martinez*, 270 F.3d at 856-57.  If the Court determines
that Plaintiff presented a *prima facie* case, it must ascertain whether the right
allegedly violated was clearly established by federal law.  *Id.*  Finally, the Court
must determine whether a reasonable officer would have known that his conduct
violated the law.  *Saucier*, 533 U.S. at 198; *Martinez,* 270 F.3d at 857-58.  If the
status of the right is unclear or unsettled, qualified immunity is appropriate.  *Elder
v. Holloway*, 510 U.S. 510, 515 (1994).

The first issue the Court must determine (under both § 1983 and the doctrine
of qualified immunity) is whether Plaintiff has alleged the deprivation of a
federally-protected statutory or constitutional right.  *Conn v. Gabbert*, 526 U.S.
286, 290 (1999).  As illustrated in the analysis above, Plaintiff has established a
genuine issue of material fact as to the deprivation of her property and liberty
interests without due process.  The requirements for a pretermination hearing and a

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 32

name-clearing hearing are rights that are clearly established by federal law. *E.g.*, *Loudermill*, 470 U.S. at 538 (pretermination hearing required for public employees); *Codd*, 429 U.S. at 628 (name clearing hearing required if "employer creates and disseminates a false and defamatory impression about the employee in connection with his termination").

Taking the evidence in a light most favorable to Plaintiff, Sheriff Harum could have decided on an unlawful basis before viewing the report and conducting the background investigation that Ms. Groseclose failed. Assuming this is the case, a reasonable officer would have known that such conduct violated the law. Therefore, Sheriff Harum does not have qualified immunity. Undersheriff Meinzer did not participate in the decision that Plaintiff failed her background investigation, nor did Sgt. Sisson. Therefore, Plaintiff has not alleged unconstitutional behavior on their part.

### iv.   Municipal Liability under § 1983

As described above in the discussion for the City's Motion for Summary Judgment, the Supreme Court in *Monell*, 436 U.S. at 689-90, and later cases held that municipalities and other local governmental bodies are "persons" and may be held liable under § 1983. The Court limited this holding so that a municipality may not be held liable under § 1983 "*solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691 (emphasis in original). Liability will be imposed on a government that "under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Id.* at 692.

Plaintiff asserts three alternative theories of municipal liability against Chelan County: (1) the County's policy or custom was executed by and injury inflicted by one whose edicts or acts may be fairly said to represent official policy; (2) a deliberate choice to follow a course of action was made from among various alternatives by the officials responsible for establishing final policy with respect to

1  Plaintiff's employment; and (3) the County failed to adequately train on relevant

2  issues, amounting to deliberate indifference to the constitutional rights of persons

3  with whom the police come into contact.  As in Plaintiff's response to the City's

4  Motion for Summary Judgment, Plaintiff's third theory of liability for failure to

5  train again fails.  She has not alleged that the County's *training* policy amounted to

6  a deliberate indifference of her rights as the policy relates to CCSO's hiring

7  practices.  However, her other two theories of municipal liability require further

8  discussion.

9      "Whether a particular official has policy-making authority is a question of

10  state law."  *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992); *see also*

11  *McMillian v. Monroe County, Ala.*, 520 U.S. 781, 784-87 (1997).  In *McMillian*,

12  the Supreme Court used a two-step analysis to determine whether an Alabama

13  sheriff was a state or a county official policymaker.  520 U.S. at 784-87.  First,

14  courts must determine the function the official was performing.  Second, courts are

15  to define the official's functions under state law to determine whether the official

16  was acting for the state, county, or city when performing those functions.  *Id*. at

17  785-86.  Here, Plaintiff's § 1983 claim rests on Sheriff Harum's decision that she

18  failed her background investigation, which was a hiring decision.

19      The Ninth Circuit considered the question of whether a Washington county

20  sheriff is an official policymaker and in which areas in *Davis v. Mason County*,

21  927 F.2d 1473, 1480-81 (9th Cir. 1991), *cert. denied* 502 U.S. 899 (1991)

22  (overruled on other grounds).  The question in *Davis* was whether a county sheriff

23  is the official policymaker for training decisions.  In deciding the sheriff is the

24  official policymaker in that capacity, the Ninth Circuit cited RCW 36.28.010,

25  which states the county cheriff "is the chief executive officer and conservator of

26  the peace of the county."  *Davis*, 927 F.2d at 1480.  The court distinguished the

27  function of training from the function of personnel hiring practices.  *Id*. at 1480-81.

28  It noted that the Washington Sheriff's Office Civil Service statute's purpose "is to

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 34

1   establish a merit system of employment for county deputy sheriffs and other

2   employees of the office of county sheriff[.]" *Id*. at 1480 (quoting RCW 41.14.010).

3   "To this end, the [Washington Sheriff's Office Civil Service] Commission is

4   empowered to make rules and regulations regarding 'appointments, promotions,

5   reallocations, transfers, reinstatements, demotions, suspensions, and discharges,'

6   along with 'other matters connected with the general subject of personnel

7   administration.'" *Id*. at 1480-81 (quoting RCW 41.14.060(1)).

8       Consequently, Sheriff Harum and other Washington county sheriffs are the

9   official policymakers for law enforcement and peace officer training, but not for

10  hiring and personnel decisions.  That function falls with the Civil Service

11  Commission.  Because Sheriff Harum was not the official policymaker for Chelan

12  County regarding hiring decision, but was instead allegedly acting outside and

13  contrary to County policy, municipal liability cannot be imputed to Chelan County

14  for his actions. *See Brown*, 520 U.S. at 404 (explaining that a plaintiff "must also

15  demonstrate that, through its *deliberate* conduct, the municipality was the 'moving

16  force' behind the injury alleged").  Sheriff Harum was not the official policymaker

17  of Chelan County for hiring decisions at CCSO, so his decision that Plaintiff failed

18  her background investigation was not a municipal action by the County, let alone

19  deliberate conduct.

20      Moreover, Plaintiff has not established that the County Civil Service

21  Commission "ratified" Sheriff Harum's decision that Plaintiff failed her

22  background investigation.  A municipality may be liable under § 1983 if an official

23  with policymaking authority ratified a subordinate's unconstitutional decision and

24  the basis for it. *Gillette*, 979 F.2d at 1346-47 (citing *City of St. Louis v.

25  Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion)).  "*Praprotnik* requires

26  that a policymaker approve a subordinate's decision *and the basis for it* before the

27  policymaker will be deemed to have ratified the subordinate's discretionary

28  decision." *Id*. at 1348 (citation omitted).  Sheriff Harum's decision that Plaintiff

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 35

did not pass her background investigation was a discretionary action; even if unconstitutional, it is not chargeable to the municipality under § 1983. *See id.* at 1347. Accordingly, there being no genuine issue of material fact as to Chelan County's liability under § 1983, Plaintiff's claims against Chelan County are dismissed.

**III.   Plaintiff's Cross-Motion for Summary Judgment**

The analysis above has established that there are genuine issues of material fact regarding several of Plaintiff's claims against the County Defendants. Plaintiff in her cross-motion for summary judgment contends (1) CCSO is vicariously liable for Sgt. Sisson's violation of her due process rights, liberty interests, Civil Service laws, and her employment contract through Sisson's dual capacity as Sergeant and Chief of Police; (2) CCSO is vicariously liable for Sheriff Harum's discriminatory denial of Plaintiff's transfer in violation of the Civil Service statute, Civil Service rules, and 42 U.S.C. § 1983; (3) CCSO defamed Plaintiff; and (4) CCSO has engaged in gender discrimination. Plaintiff further maintains Sgt. Sisson was a dual agent/employee of the City and CCSO, acting on official City policy with respect to the suspension and de facto termination of Plaintiff. Plaintiff claims that the Court for these reasons should both deny Defendants' motions for summary judgment and grant her cross-motion.

In considering Plaintiff's motion, the Court must take the evidence in the light most favorable to the non-moving parties. Because the Court has established that a genuine issue of material fact exists as to the claims discussed above, the Court denies Plaintiff's cross-motion for summary judgment.

CONCLUSION

The Court offers the following synopsis of the remaining claims to aid the Court and the parties in preparing for trial. Plaintiff's claims against the City of Chelan are dismissed. Plaintiff's breach of contract claim against the remaining Defendants is also dismissed. Plaintiff's claims for violation of RCW 41.14.250-

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 36

.270, defamation, and gender discrimination against the County Defendants remain. Plaintiff's § 1983 claim is dismissed as to Defendants Meinzer, Sisson, and Chelan County. However, she has raised a genuine issue of material fact as to Sheriff Harum's decision regarding the background investigation. Therefore, Plaintiff's § 1983 claim for deprivation of property and liberty interests without due process as a result of the denial of transfer remain.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendants Chelan County & Individuals' Motion for Summary Judgment (Ct. Rec. 33) is **GRANTED in part, DENIED in part**.

2. Defendant City of Chelan's Motion for Summary Judgment (Ct. Rec. 41) is **GRANTED**.

3. Plaintiff's Motion to Strike (Ct. Rec. 57) is **DENIED.**

4. Plaintiff's Cross-Motion for Summary Judgment (Ct. Rec. 63) and Plaintiff's Cross-Motion for Summary Judgment (Amended) (Ct. Rec. 71) are **DENIED**.

5. Defendants Chelan County & Individuals' Motion to Strike Declaration in Opposition to Motion (Ct. Rec. 75) is **DENIED**.

6. Plaintiff's Motion in Limine (Ct. Rec. 81) is **DENIED as moot**.

7. Defendant City of Chelan's Motion to Expedite (Ct. Rec. 99) is **DENIED as moot**.

8. Defendant City of Chelan's Motion to Strike Reply Memorandum (Ct. Rec. 101) is **DENIED**.

9. Due to scheduling changes, the telephonic pretrial conference set for January 20, 2006, is **stricken**. A new telephonic pretrial conference is **set** for **January 27, 2006, at 10:00 a.m.** The trial date of **February 6, 2006**, remains unchanged.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and forward copies to counsel.

**DATED** this 13th day of January, 2006.


                    s/ Robert H. Whaley
                  ROBERT H. WHALEY
              Chief United States District Judge




Q:\CIVIL\2004\Stearns-Groseclose\grant.sj.ord3.wpd

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT, *INTER ALIA* * 38